# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00095-CV

**Benchmark Land Development, Inc., Appellant**

**v.**

**John C. Wooley, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. 96-14398, HONORABLE PAUL DAVIS, JUDGE PRESIDING**

---

Benchmark Land Development, Inc. ("Benchmark") brought this lawsuit to collect on a promissory note which it had obtained from John C. Wooley. Wooley answered the suit and filed a counterclaim alleging the promissory note sued upon was tainted by usury. Both parties filed motions for summary judgment on the usury claim. The trial court found that Benchmark had committed usury in excess of twice the amount allowed by law, thus requiring Benchmark to forfeit all principal and interest and pay Wooley three times the amount of usurious interest charged. Tex. Fin. Code Ann. §§ 305.001-.002 (West Supp. 2001). The trial court then entered a final judgment in favor of Wooley for $145,680.05 in usury penalties plus attorney's fees. Benchmark appeals. Because we conclude that there are significant material fact issues present in this dispute which make a summary judgment improper, we will reverse the decision of the trial court and remand this cause for further proceedings.

## BACKGROUND

In the late 1980s, Benchmark was formed in order to invest in the then-depleted Austin real estate market. Wooley acted as Benchmark's link to the local market because the company was owned by two overseas investors, Juan Miguel Villar-Mir, Sr. and John Rosillo.[1] Wooley served as an officer and director of Benchmark until 1996 and was directly involved with Benchmark's daily operations. As Benchmark's president, Wooley was expected to seek out and manage investments for Benchmark. Wooley was not paid a salary for his services because Benchmark had little operational capital due to its start-up status. Instead, Wooley expected to receive substantial compensation from an equity interest he would earn as a result of his services to Benchmark. Also due to its start-up status, Benchmark did not have its own office space. Thus, Wooley agreed to let Benchmark use the office space and personnel employed by Wooley's companies, John C. Wooley Interests, Inc. and Schlotzsky's, Inc. In return for Wooley's managerial services, the use of his office space and personnel, and to cover the cost of ordinary expenses, Benchmark agreed to pay Wooley a monthly overhead reimbursement of $7,500.

This dispute centers around a series of transactions in which funds were transferred between Wooley and Benchmark. The disputed transactions occurred between February 28, 1989 and September 30, 1991. The parties disagree whether the transactions in which Wooley obtained and used Benchmark's funds were authorized loans, unauthorized receipt of funds, or advances on

---

[1] Benchmark Land Development, Inc., the appellant, is one of two subsidiaries of a company called Benchmark Group, Inc. Benchmark Group, Inc. is a subsidiary of a company called Tiago, B.V. Juan Miguel Villar-Mir, Sr. and John Rosillo own Tiago and the Benchmark companies. Although Wooley was involved in the operations of Benchmark Group and its other subsidiary, the dispute before us only involves Benchmark Land Development, Inc. Therefore, all references to "Benchmark" are meant to refer solely to the appellant.

the monthly stipend Benchmark was paying Wooley. Wooley testified at his deposition that he and Rosillo discussed these transactions in various phone calls which occurred near the outset of Benchmark's operations. Wooley further testified that he and Rosillo came to an understanding that Wooley and Benchmark would occasionally need to transfer funds between themselves to pay for various unspecified items because of Benchmark's situation as a start-up company. However, all of these early conversations were apparently between Wooley and Rosillo; Villar-Mir did not participate in them. Villar-Mir became concerned with, and involved in, these transactions at a later time.

In 1991, Thomas Garcia was hired as Tiago's managing director. Apparently, Garcia, after reviewing Benchmark's records, began questioning some of these transactions. Garcia then brought the matter to the attention of Villar-Mir. Villar-Mir was uncomfortable with the amounts of funds and reimbursements Wooley was receiving from Benchmark. Sometime thereafter, Benchmark became concerned that some of the transactions either were not authorized or the funds received were not being used for Benchmark's benefit. Therefore, Villar-Mir authorized Garcia to revise the reimbursements. The apparent goal of the revision was for Garcia to determine the proper reimbursement amount that Benchmark owed Wooley and then to subtract that figure from the overall amount of funds that Wooley had received from Benchmark. Ultimately, Villar-Mir intended to have Wooley sign a promissory note for the amount remaining.

Garcia prepared a spreadsheet that he believed accurately outlined every transaction between Wooley and Benchmark and arrived at an amount that Benchmark believed it was owed. The balance of that first spreadsheet was approximately $280,000. Wooley disagreed with the accuracy of the figures presented. In response, Wooley sent a memorandum to Garcia outlining what Wooley believed to be the proper and agreed upon reimbursements that he was entitled to as a result

3

of his services to Benchmark.  Wooley explained that "we have had periods during the startup of Benchmark Group, Inc. in which funds were not available, therefore John C. Wooley Interests, Inc. and Schlotzsky's forwarded any deficits."  Subsequently, Garcia prepared a response memorandum which explained Benchmark's understanding of the reimbursements that it felt were owed to Wooley. A short time after Garcia sent his response memorandum, he prepared and submitted a finalized spreadsheet which showed an amount of $267,691 that Wooley owed to Benchmark.  The record does not indicate whether there was additional correspondence between Wooley and Garcia after Garcia sent his response memorandum.  However, Wooley's pleadings indicate that he now disputes the spreadsheet's final balance, claiming that $33,648.20 of that sum was "clearly not owed" to Benchmark.

This final balance of $267,691 incorporated all of the outstanding funds that Wooley received from Benchmark as well as interest charged on those funds.  The spreadsheet lists the alleged principal amount owed to Benchmark after subtracting all overhead reimbursements allegedly due to Wooley as $217,433.  Additionally, the spreadsheet shows $50,258 as the amount of interest that accrued and was applied to the overall balance.  The spreadsheet shows that an interest rate of eleven and one-half percent was charged on each transaction.  The spreadsheet also indicates the number of days between transactions.  However, the spreadsheet does not provide an indication regarding how Benchmark calculated the interest charged.  It is unclear from the record whether interest was charged on the funds for the number of days indicated on the spreadsheet, whether interest was charged on the overall balance for the days stated, or whether the days simply show how long Wooley had use of Benchmark's funds.  Furthermore, no indication exists, either on the spreadsheet or in the

4

record, that would allow one to ascertain the manner in which Benchmark made its interest calculations and whether the interest charged was simple or compounded.

Putting aside the questions concerning how Benchmark calculated the interest, the spreadsheet and other evidence in the record raise significant factual questions about the individual transactions. The amount of the transactions vary from as little as $100 to as much as $100,000. Oddly, no single transaction shows a transfer for the apparently agreed upon $7,500 monthly stipend that Benchmark allegedly owed Wooley. Our search of the record reveals numerous checks that were written with notations on them indicating that they were for various purposes such as loans, services rendered, management fees, and reduction of payable. Irrespective of these notations, the record does not indicate that the parties have agreed that these notations accurately represent the character of each and every transaction. This doubt is reinforced by the allegations from Garcia's affidavit, the maker of the spreadsheet, concerning the unauthorized taking and use of Benchmark's funds. While Wooley takes great offense at these allegations, they are nonetheless serious *indeed*. Furthermore, we believe that some transactions are factually confusing. For example, the spreadsheet shows that on the same day, December 13, 1990, two transactions occurred—one transferring $50,000 from Benchmark to Wooley and another transferring $50,000 from Wooley to Benchmark. Nothing in the record explains this transaction.

Based on the finalized spreadsheet, Benchmark obtained a promissory note from Wooley for the principal amount of $267,691 with an interest rate to be calculated at eleven and one-half percent, compounded quarterly. The original promissory note came due on December 31, 1992. On that day, Wooley discharged the original note by executing a second promissory note with the same terms as the first note, except that the principal had been adjusted, because of accrued interest,

5

to $308,613. The second note came due one year from the date of execution. Finally, under the same terms, but with the apparent intention that it would mature on December 31, 1995,[2] Wooley executed a third note for the amount of $345,664.16. Wooley never made any payments on any of the notes. After the third note came due, Benchmark filed this lawsuit. Wooley answered, raising affirmative defenses and also asserting a usury counterclaim against Benchmark.

Wooley's counterclaim alleges that the promissory note sued upon is tainted by usury. Wooley claims that there was never an agreement between the parties regarding the charging of interest. Thus, he claims that the $50,258 Benchmark indicated as interest on the spreadsheet and added to the principal amount of the original promissory note constitutes usury. Wooley also claims that at least $33,000 charged to him as part of the principal on the original note was not owed by him and therefore results in an additional charge of usurious interest. Finally, Wooley alleges that the third promissory note, although its terms purport to charge eleven and one-half percent interest, compounded quarterly, actually provides for eighteen percent interest, compounded quarterly.

Wooley's usury claim is premised on the contention that both he and Benchmark treated all of the transactions as loans. He further claims that he and Rosillo never discussed the charging of interest. Accordingly, Wooley claims that the usury statute places a maximum interest rate of six percent on any loan transaction in which an agreement concerning interest is absent. Tex. Fin. Code Ann. § 302.002 (West Supp. 2001). Wooley also claims that, because of its unexplained manner of calculating interest on the spreadsheet, Benchmark incorporated interest charged in excess

---

[2] The third promissory note was signed on December 31, 1993. The face of the note indicates that it was also due on that same day; however, evidence in the record establishes that the parties intended a maturation date of December 31, 1995.

6

of twelve percent into the first note. Wooley asserts that this is true even though the stated rate on the spreadsheet says eleven and one-half percent. Finally, Wooley claims that because the amount of interest charged was more than double the maximum rate allowable by law, Benchmark must forfeit its principal and pay Wooley a penalty for charging usurious interest. *Id*. § 305.002.

After Benchmark filed its lawsuit, Wooley filed his answer and counterclaim alleging usury. Benchmark filed a partial motion for summary judgment contending that Wooley could not prevail on his usury claim as a matter of law. Wooley responded by filing a motion for summary judgment on his usury counterclaim. The trial court denied Benchmark's partial motion for summary judgment and granted Wooley's motion rendering final judgment in his favor. Benchmark raises two issues in its appeal from this judgment. Benchmark contends, in its first issue, that Wooley's usury counterclaim fails as a matter of law and that its partial motion for summary judgment should have been granted by the trial court. Alternatively, Benchmark claims by its second issue that it raised genuine issues of material fact which render judgment on Wooley's motion for summary judgment improper.

**DISCUSSION**

The function of a summary judgment is not to deprive a litigant of its right to a full hearing on the merits of any real issue of fact but is to eliminate patently unmeritorious claims and untenable defenses. *Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952). A defendant moving for summary judgment must establish as a matter of law that there is no genuine issue of material fact as to one or more of the essential elements of the plaintiff's cause of action. *Wilmer v. Laidlaw Waste Sys. (Dallas), Inc.*, 890 S.W.2d 459, 463 (Tex. App.—Dallas 1994), *aff'd*, 904 S.W.2d 656 (Tex.

7

1995); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 354 (Tex. App.—Austin 1996, no writ). A plaintiff, as movant in a summary judgment proceeding, has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Wilmer*, 890 S.W.2d at 463. In deciding whether a disputed material fact issue exists, we accept as true evidence favorable to the nonmovant. *Nixon*, 690 S.W.2d at 548-49. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id*. at 549. When the parties file competing motions for summary judgment and one is granted and the other denied, the reviewing court should review the summary-judgment evidence presented by both sides and determine all questions presented. *Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).

The essential elements of a usurious transaction are: (1) a loan of money; (2) an absolute obligation that the principal be repaid; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982); *Starcrest*, 926 S.W.2d at 354. Usury is committed if the creditor contracts for, charges, or receives interest greater than the amount authorized by law. Tex. Fin. Code Ann. § 305.001(a). In order for the grant of summary judgment on Wooley's motion to be proper, the trial court must have found that all elements of usury had been met, as a matter of law, and that no genuine issues of material fact existed as to any one element. After reviewing the record, we find that genuine issues of material fact exist which render this case improper for disposition on summary judgment.

In defending the summary judgment, Wooley maintains that all of the advances he received from Benchmark were authorized transactions that were intended by the parties to be a loan. Benchmark disputes this characterization of the transactions. Benchmark maintains that many of the

8

disbursements were unauthorized and that the execution of the original promissory note was the culmination of a negotiated settlement. Benchmark contends that because there was no loan transaction, there can be no usury. In the face of Garcia's affidavit on behalf of Benchmark alleging that many of these disbursements were unauthorized, Wooley is required to shoulder a heavy burden to uphold the summary judgment. Wooley must establish, as a matter of law, from the summary judgment evidence that there is no fact dispute present regarding the characterization of *all* of the transactions between he and Benchmark as loan transactions. Because of imbedded and material factual issues, Wooley has not met his burden.

We note initially that intent is normally a fact question uniquely within the realm of the fact-finder because it so heavily depends on the weight and credibility to be given to the witnesses' testimony. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Here, the knowledge and intentions of the parties as to all aspects of the disbursements are relevant considerations in determining whether usury has been committed. However, such issues are rarely, if ever, appropriate for summary judgment. *Fleetwood v. Med Ctr. Bank*, 786 S.W.2d 550, 556 (Tex. App.—Austin 1990, writ denied).

Wooley maintains that all of the advances, as evidenced objectively by the spreadsheet, are authorized loans.[3] To prevail, it was incumbent on Wooley to establish as a matter of law, with no factual controversy present, the essential elements that (1) all of the disbursements were

---

[3] When Benchmark first became concerned with the amounts and use of the money in the now disputed transactions, Wooley maintained that he was entitled to much of the money as overhead reimbursements or other advances without any obligation of repayment. Wooley now claims that all of these transactions were authorized loans—made under an oral agreement that the funds would be repaid in full but free of interest.

authorized, and (2) all of those disbursements over and above the reimbursements he was entitled to were considered loans. A conclusive showing of the parties' intent is essential in establishing these elements. While *conclusively* establishing a party's intent as a matter of law is a difficult task in and of itself, here the situation is complicated even further because, although we have the depositions of Wooley and Rosillo, we do not have testimonial evidence from Villar-Mir. We do, however, have an affidavit from Garcia on Benchmark's behalf.

For the first element, Wooley testified that all of the disbursements were authorized by Rosillo. He further claims that he and Rosillo have confirmed this situation to be true. In support of this position, Wooley relies on Rosillo's deposition testimony. However, we do not find Rosillo's testimony sufficient to *conclusively* establish this material issue of fact as a matter of law. At his deposition, Rosillo was presented with a group of checks and other financial documentation. He was then asked whether he specifically authorized *any* of those disbursements. His answer was "Mr. Villar Mir authorized these. I don't know. You know, I think it may help you to understand how the company works." Wooley provides no other evidence to establish this element. This testimony simply does not establish *conclusively* that Rosillo authorized all of the disputed transactions.

To controvert that the advances were authorized, Benchmark provides Garcia's affidavit as evidence that the disbursements were unauthorized. Garcia, who acted as Villar-Mir's and Benchmark's agent in this dispute, states in his affidavit that Benchmark "believed that Wooley, during the course of 1989, 1990 and 1991, without the consent or authorization of the Benchmark Group, transferred certain funds from the Benchmark Entities into accounts that he controlled and that were not for the benefit of the Benchmark Entities." Wooley attempts to dismiss Garcia's affidavit on the grounds that Garcia lacked personal knowledge of these disbursements because

10

Garcia only joined Tiago in August 1991, at the conclusion of these transactions. However, Garcia acted under the express direction of Villar-Mir, one of Benchmark's two principal owners. Therefore, we find Garcia's affidavit sufficient to raise a fact issue in controversion of Wooley's testimony that all of the transactions were authorized. Because this first element depends so heavily on the intent of the parties, we cannot say that either position can be established as matter of law.

But even assuming, without deciding, that all of the disbursements were authorized, we must still examine whether the parties intended the transactions to be loans. A "loan" is an act of lending whereby one party delivers to another party a sum of money upon an agreement, express or implied, to repay it, usually with interest. Black's Law Dictionary 912-13, 947 (7th ed. 1999). Absent an agreement to repay by the parties there can be no loan. If there was no loan, there can be no usury. *See Starcrest*, 926 S.W.2d at 354. The summary judgment evidence shows that, although the parties disagree as to the exact details, they had an agreement that Wooley would receive funds from Benchmark for operational and management costs. In order to sustain his summary judgment, Wooley must establish, as a matter of law, that all disbursements not covered by the parties' $7,500 monthly reimbursement agreement were subject to a separate express or implied loan agreement.

Benchmark believed from the outset of the controversy that Wooley was receiving funds in excess of the amount Benchmark had agreed to pay for overhead reimbursement. Benchmark further believed that some of the funds Wooley was receiving were not being used for Benchmark's benefit and that Wooley was improperly allocating some of his claimed overhead reimbursement. Wooley rejoins by saying that, as is the nature of a start-up, it was necessary for him to loan money to Benchmark if its cash flow became depleted. The problem with this contention is that Wooley was most often the debtor and not the creditor, as he claims was his necessary role, in

11

these transactions. This situation is most pronouncedly true in the transactions involving large sums of money. In only one transaction for more than $10,000 was Wooley the creditor, and that transaction was the previously mentioned, confusing same-day receipt and repayment of $50,000.

In order to show that it did not consider the allegedly unauthorized disbursements to be loans, Benchmark contends that the parties were working toward a settlement of their dispute over the disbursements Wooley had received. The correspondence between Garcia and Wooley demonstrates that, to some degree, the preparation of the spreadsheet constitutes some evidence that the parties were attempting to negotiate a settlement. In support of this argument, Benchmark cites cases in which a promissory note was given in compromise and settlement of an underlying bona fide dispute. *See Miller v. Lawrence*, 415 S.W.2d 505, 509 (Tex. Civ. App.—Austin 1967, no writ); *Miller v. Aaron*, 413 S.W.2d 426, 428 (Tex. Civ. App.—Dallas 1967, writ ref'd n.r.e); *Aydelotte v. Anderson*, 284 S.W.2d 804, 805-06 (Tex. Civ. App.—Amarillo 1955, writ ref'd n.r.e.). Benchmark claims the situation here is analogous to these cases. Benchmark also relies on these cases to show that once a note is given in compromise of a bona fide dispute, the maker cannot later attack that note by claiming usury.

In response to Benchmark's claim of compromise and settlement, Wooley contends that, although the transactions lacked the formalities of most lending agreements, the disbursements were intended by the parties to be loans. In support of his position Wooley cites cases in which the courts have held transactions to be loans even though ordinary creditor/debtor loan agreements were lacking. *See Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc.*, 12 S.W.3d 859, 875-76 (Tex. App.—Texarkana 2000, no pet.) (promissory note with option for holder to convert the total to securities is loan); *Varel Mfg. Co. v. Acetylene Oxygen Co.*, 990 S.W.2d 486, 491-92 (Tex.

App.—Corpus Christi 1999, no pet.) (past due account for sale of gas on open account is loan); *Johns v. Jaeb*, 518 S.W.2d 857, 859 (Tex. Civ. App.—Dallas 1974, no writ) (money advanced to start-up company with absolute obligation to repay is loan).

While these cases are illustrative of each side's argument, they do not allow either party to overcome the imbedded fact issues in this case. Therefore, in our view, neither Benchmark nor Wooley can establish its position as a matter of law. Both essential elements that Wooley is required to establish ultimately turn on questions of fact concerning the parties' knowledge and intent. Accordingly, neither party is able to establish its position as a matter of law. *See Fleetwood*, 786 S.W.2d at 556. We sustain Benchmark's second point of error and hold that the grant of summary judgment was improper.

However, our inquiry does not end here because we must address Benchmark's first issue on appeal that Wooley's usury counterclaim fails as a matter of law. Benchmark claims that the spreading doctrine legally bars this transaction from being usurious. The spreading doctrine requires that the interest charged on a contract or note be spread over the entire term of the note, or multiple notes as is the case here. *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 786-87 (Tex. 1977). If, by spreading, the interest rate charged falls below the lawful limits, then there can be no usury as a matter of law. *Id.* at 787.

When Wooley executed the original promissory note that charged eleven and one-half percent interest, compounded quarterly, Benchmark contends that it was entitled to charge him up to the statutory maximum of eighteen percent.[4] It makes the same contention regarding the second

---

[4] Benchmark does not cite us to the statutory provision in the Finance Code that establishes that Benchmark is entitled to charge a maximum of eighteen percent. We note that the section of the

and third promissory notes. The crux of this point, however, is the *method* by which Benchmark attempts to apply the spreading doctrine. Benchmark contends that the interest that was allegedly usurious as set out on the finalized spreadsheet must be spread throughout the three notes. Benchmark contends that this results in an effective interest rate of 17.18%. Thus, it contends that by applying the spreading doctrine the interest initially charged is not usurious. We disagree.

Benchmark is unable to cite us to a single case, and we have found none, that permits the application of the spreading doctrine to a transaction that begins as an oral agreement and culminates in a series of written promissory notes. This point is important because Wooley contends that the usurious transaction here is the original charging of interest on the finalized spreadsheet. The law is well established that once usury is committed, it cannot be cured by a subsequent transaction. *See Danziger v. San Jacinto Sav. Assoc.*, 732 S.W.2d 300, 302 (Tex. 1987) (credit to account after charging had occurred was ineffective in attempting to cure usury); *Southwestern Inv. Co. v. Hockley County Seed & Delinting, Inc.*, 516 S.W.2d 136, 137 (Tex. 1974) (reduction of final payment due in attempt to cure usury was ineffective because original charging, rather than actual receipt of interest, was usurious act); *Cigna Ins. Co. v. TPG Store, Inc.*, 894 S.W.2d 431, 436 (Tex. App.—Austin 1995, no writ) (refund of interest charged and received could not cure usury which had occurred as result of charging). Applying this line of cases, Wooley's signature on the original promissory note could not cure the prior allegedly usurious interest required by Garcia's finalized spreadsheet. Thus, the prospective use of the spreading doctrine throughout the three promissory

---

Finance Code that permitted a maximum rate of eighteen percent has been amended and no longer contains an eighteen percent maximum. Tex. Fin. Code Ann. § 302.102 (West Supp. 2001). However, this point is not necessary to our discussion.

notes negotiated between Wooley and Benchmark is irrelevant to the earlier allegedly usurious interest charged. Because Benchmark has failed to conclusively establish as a matter of law that the application of the spreading doctrine bars Wooley's usury claim, we overrule its first issue.

## CONCLUSION

In light of our discussion above and because of the fact issues present, we hold that this case is improper for disposition on summary judgment. We also hold that the applicability of the spreading doctrine has not been established conclusively as a matter of law. We therefore reverse the judgment of the trial court and remand this cause for further proceedings.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Reversed and Remanded

Filed: December 20, 2001

Do Not Publish

15